CASE OF FORMER RESIDENCE BY A CHINESE LABORER.

*In re* CHEEN HEONG, on *Habeas Corpus.*

(*Circuit Court, D. California.*  September 29, 1884.)

CHINESE IMMIGRATION—ACTS OF 1882 AND 1884—CHINESE LABORERS—CERTIFICATE—FORMER RESIDENCE IN UNITED STATES.

A Chinese laborer resided in the United States from November 17, 1880, until June, 1881, when he departed for Honolulu, in the Hawaiian kingdom, where he remained until September, 1884, when he sought to re-enter the United States. *Held,* that the acts of 1882 and 1884 did not except him from the necessity of presenting the certificate required by those acts, and that without it he could not be allowed to re-enter.

SAWYER, SABIN, and HOFFMAN, JJ., dissenting.

On *Habeas Corpus.*

*T. D. Riordan* and *L. I. Mowry,* for petitioner.

*S. G. Hilborn* and *Carroll Cook,* for the United States.

Before FIELD, Justice, SAWYER, SABIN, and HOFFMAN, JJ.

FIELD, Justice.  The facts of this case differ from those in the *Case of the Chinese Laborer with an Unused Tag, ante,* 701, recently decided, in this particular: that the laborer there left the United States, after the passage of the act of 1882, without a certificate enabling him to return, relying upon a tag entitling him to such a certificate, but which he had not obtained, while the laborer here left before the passage of the restriction act, and of course before any certificate was required.  It appears, from the agreed statement of facts, that the petitioner is a laborer of the Chinese race, and a subject of the emperor of China; that he resided within the United States on the seventeenth of November, 1880, and continued his residence until June, 1881, when he departed for Honolulu, in the Hawaiian Kingdom, where he remained until September of the present year, (1884,) and then returned to the port of San Francisco, and, of course, without any certificate under the act of 1882, or that of 1884, as none could be issued to him while out of the country; and he now seeks to land by virtue of his residence here on the seventeenth of November, 1880, contending that the acts of 1882 and 1884 except Chinese laborers in like situation from the necessity of presenting any certificate, inasmuch as it would be impossible to obtain one.

My associate, the circuit judge, sustains the contention of the petitioner, and in a written opinion has presented his construction of the act with his usual elaboration and learning.  The district judge of this district and the district judge of the district of Nevada concur with him.  It is, therefore, with much diffidence that I venture to express my dissent from their conclusions.  The restriction act of 1882 in its first section declares that, after 90 days from its passage, and for the period of 10 years from its date, the coming

of Chinese laborers to the United States is suspended, and that it shall be unlawful for any such laborer to come, or, having come after the 90 days, to remain within the United States. The second section .makes it a misdemeanor punishable by fine, to which imprisonment may be added, for the master of any vessel knowingly to bring within the United States from a foreign port and land any such Chinese laborer. The third section then provides that the two sections mentioned shall not apply to Chinese laborers who were in the United States on the seventeenth of November, 1880, or who came within 90 days after the passage of the act, "who shall produce to such master *before going on board such vessel,* and shall produce to the collector of the port in the United States at which such vessel shall arrive, *the evidence hereinafter in this act required of his being one of the laborers in this section mentioned;*" nor shall they apply to the case of a master of a vessel coming within the jurisdiction of the United States by reason of stress of weather, or touching at any port of the United States on its voyage to a foreign port,—the laborers brought to depart with the vessel.

What, then, is the evidence which must thus be produced to the master in the foreign port, and to the collector at the port of the United States, by the laborers thus within the exception mentioned? The fourth section answers this. It declares that, for the purpose of identifying those laborers,—that is, those who were here on the seventeenth of November, 1880, or came within the 90 days mentioned,—and to furnish them with "the proper evidence" of their right to go from and come to the United States, the "collector of customs of the district *from which any* such Chinese laborer shall depart from the United States, shall, in person or by deputy, go on board such vessel having on board any such Chinese laborer, and cleared or about to sail from his district for a foreign port, and on such vessel make a list of all such Chinese laborers, to be entered in registry books to be kept for that purpose, with a statement of the age, occupation, last place of residence, and of physical marks or peculiarities of each one necessary to his identification; and each laborer thus departing shall be entitled from the collector, or his deputy, to a certificate containing such particulars corresponding with the registry as may serve to identify him. "The certificate herein provided for," says the section, "shall entitle the Chinese laborer, to whom the same is issued, to return and to re-enter the United States upon producing and delivering the same to the collector of customs of the district at which such Chinese laborer shall seek to re-enter."

Now, what is the meaning of these provisions? It is not, as I read them, that the Chinese laborer in the United States on the seventeenth of November, 1880,—the date of the supplementary treaty, —or who came within 90 days after the passage of the act,—that is, before it took effect,—shall be subsequently permitted—that is, after the act had taken effect—to come without any certificate, for the act

makes no exceptions of persons by whom it must be obtained. It means, in my judgment, that those laborers, *if still in the United States when the act takes effect,* and desirous to leave and yet return again, shall be permitted to do so upon obtaining the prescribed certificate. The production of that certificate is the only protection of the master of the vessel against criminal prosecution for bringing and landing those laborers after the expiration of 90 days from the passage of the act; it is the only evidence which the act requires to be furnished by them, and its production is the essential condition prescribed for their landing. The act, interpreted according to its direct language, necessarily excludes in its operation those who left the country before the act took effect. If this construction works any hardship, it is for congress to change the act. The court has no dispensing power over its provisions. Its duty is to construe and declare the law, not to evade or make it. Oftentimes, indeed, there is a sense of impatience in the public mind with judicial officers for not announcing the law to be what the community at the time wishes it should be. And nowhere has this feeling been more manifested than in California, and on no subject with more intensity than that which touches the immigration of Chinese laborers; but it often does great injustice to officers anxious to perform their whole duty. While I differ from my associates in the construction of the restriction act, I can bear testimony to the great solicitude manifested by them to reach a right conclusion. If, as already stated, the law works any hardship, it is for congress to change it. With that body it rests, under the constitution, to determine what foreigners shall be permitted to come to the United States and on what conditions to remain.

The provisions of the amendatory act of 1884 seem to me to remove any doubt as to the necessity of the certificate, if any existed under the act of 1882, for the admission of any Chinese laborers, who may have left the country before the passage of the original act. Under the construction adopted in this circuit, parol evidence had been allowed in a multitude of cases where previous residence was alleged; and the district and circuit courts were blocked up by them, to the great delay of their general business and the inconvenience of suitors. This circumstance, and the suspicious character, in many instances, of the testimony produced, from the loose notions entertained by the witnesses as to the obligation of an oath, created a general expression of a desire for further legislation placing some restriction upon the evidence which should be received. This desire led to the passage of the amendatory act; and by that it is declared that the certificate which the laborer must obtain "shall be the *only evidence permissible* to establish his right of re-entry" into the United States. This declaration applies to the certificate issued under either act. By it the door is effectually closed to all parol evidence. Nothing can take the place of the certificate or dispense with

it. As was said in the *Case of the Unused Tag*, "if the collector refuses to the Chinese laborer any rights to which, under the restriction act, he is entitled, he should apply to the superior of the collector at Washington, the head of the treasury department, for proper instructions to him. The court has no supervising jurisdiction over the manner in which he discharges his duty."

Writ discharged, and petitioner remanded.

SAWYER, J., *dissenting*.[1] The petitioner, a Chinese laborer, who was residing in the United States on the seventeenth day of November, 1880, left San Francisco for Honolulu, in the Hawaiian Islands, on June 18, 1881, before the passage of the Chinese restriction act of May 6, 1882, and, consequently, without the certificate prescribed by section 4 of that act. He remained at Honolulu till September 15, 1884, when he embarked for San Francisco, in the state of California, at which port he arrived September 22, 1884. He now claims the right to re-enter the United States, and to land from the steamship on which he came, upon other satisfactory evidence of his former residence and departure, without producing the certificate prescribed by section 4 of the act, either as it originally stood or as amended by the act of July 5, 1884. The question is whether, under the restriction act and the treaty with China, he is entitled to land, upon other satisfactory proof of his former residence, without producing the certificate prescribed,—no such certificate being required at the time he left the United States, and it not being possible, under the acts of congress since passed, to obtain one. In other words, are the provisions of section 4 of said Chinese restriction act, as amended on July 5, 1884, *applicable* to Chinese laborers who resided in the United States on November 17, 1880, who afterwards departed from the United States before the passage of said act of May 6, 1882, and who did not return till September 22, 1884, after the passage of the amendatory act of July 5, 1884? or are the provisions of said section 4 only applicable to such Chinese laborers as departed *after* its passage, and who had an opportunity to procure the certificate required by it?

I have no doubt that the act and the amendatory act took effect as laws of the United States from the date of their passage, and, no doubt, that the certificate prescribed by section 4 is the only evidence of a right to re-enter the country, as to all Chinese laborers *to whom it is applicable*, or who are within the purview of its provisions. On these points I have no doubt; but construing the act upon a consideration of all its provisions, and in view of and in subordination to the provisions of the treaty, it is very clear to my mind that congress did not intend to make the provisions of section 4 applicable, and that they do not apply, to those Chinese laborers who were in the

---

[1] HOFFMAN and SABIN, JJ., who sat as consulting judges, concurred in the dissenting opinion of the circuit judge.

country on November 17, 1880, and who subsequently left the United States before the passage of the original act, and who could not possibly have obtained the prescribed certificate, and as to whom the collector could not perform the prescribed conditions imposed upon him. The act purports to be an act "to execute certain treaty stipulations with China,"—*not to abrogate them*.

It is scrupulously framed so as not, in express terms, to conflict with the provisions of the treaty. If it be held to take away any rights secured by the treaty, it must be done by construction, and by far-fetched and overstrained implications,—not because of any direct, express provision to that effect. The treaty and the act must, if possible, be so construed that they can stand together. The treaty with China authorized the government of the United States to "regulate, limit, or suspend" the coming of "Chinese laborers" to, or residence in, the United States. But it provided that "the limitation or suspension *shall be reasonable*, and shall apply *only to Chinese who may go to the United States as laborers, other classes not being included in the limitation*." And it was further expressly provided that "legislation taken in regard to *Chinese laborers will be of such character only as is necessary to enforce the regulation, limitation, or suspension of immigration*." It is still further provided that "*Chinese laborers* who are *now in the United States* (at the date of the treaty, November 17, 1880) *shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions* which are accorded to the citizens and subjects of the most favored nation." The restriction act must be construed with reference to the provisions of the treaty. Section 1 of the act, as amended in 1884, suspends the coming of Chinese laborers for 10 years, and provides that during said suspension "it shall not be lawful for any Chinese laborer to come from any foreign port or place, or, having so come, to remain in the United States." Section 2 makes it an offense for the master of any vessel to land, attempt to land, or permit to be landed, any Chinese laborer from any foreign port or place. But section 3 provides that "the two foregoing sections *shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880*, or who shall have come into the same before the expiration of ninety days next after the passage of the act, *   *   *   nor shall said section apply to Chinese laborers who shall produce to such master before going on* board such vessel, and shall produce to the collector of the port in the United States, at which such vessel shall arrive, the evidence hereinafter in this act required of his being one of the laborers in the section mentioned." Two classes are here plainly indicated, to which the prohibitory provisions "shall *not* apply;" or rather one whole class, and a subdivision of the class. The first is general, embracing all "Chinese laborers" "who were in the United States on the seventeenth day of November, 1880;" and, secondly, "*nor* shall said sections apply to Chinese

laborers who shall produce   *   *   *   the evidence hereinafter in this act required of his being one of the laborers in this section mentioned." They shall neither apply to the one class, containing all, "*nor*" to the sub-class, who shall procure and produce the prescribed certificate. Who constitute the sub-class referred to, who are required to produce the evidence hereinafter required? Plainly, those who depart *after* the passage of the act, and who procure, or who can procure, under the law, the certificate required in section 4, which can only be obtained by those subsequently departing. In the original act the language was, "shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880, * * * *and* who shall produce" the evidence prescribed. The significant change was made by dropping the "and," and adopting in its place, "*nor* shall said sections apply to Chinese laborers who produce," etc. This is, clearly, distinguishing betweeen the two classes, or the two divisions of the one class,—those laborers to whom the preceding sections *do not apply, who had already departed;* and those who should *thereafter depart*, and who, upon departing, must procure the certificate provided for in section 4. Before the amendment there was some little plausibility in claiming that none were exempt from securing the certificate, but there appears to me to be none since the amendment. Under the act as it originally stood, we held in *Leong Yick Dew,* 19 FED. REP. 490, that the provisions of section 4, relating to the certificate, did not apply to those who had departed before the passage of the act, and who could not possibly procure the certificate; and with that decision I am still entirely satisfied. *A fortiori,* under the act as amended these provisions are inapplicable.

But the provisions of section 4, *ex vi termini,* apply, and they can only apply, to those Chinese laborers who depart after the passage of the amendatory act; they cannot possibly be applied to those who have already departed. They relate to and provide for *future action* in obtaining and producing certificates; they have no relation to the past. Some entitled to return have already gone, and some may go hereafter; and it is provided that the latter shall procure the certificates, the provision necessarily having reference to the latter. It is provided, in section 4, "that for the purpose of properly identifying Chinese laborers who were in the United States on the seventeenth day of November, 1880, * * * and in order to furnish them with the proper evidence of their right to *go* from and come to the United States, as *provided in said act and treaty,* * * * the collector of customs of the district from which any such Chinese laborer *shall* depart from the United States *shall* * * * go on board each vessel *having on board* any such Chinese laborer, and cleared or *about to* sail from his district for a foreign port, and on such vessel make a list of all such Chinese laborers, which shall be entered on registry books, * * * in which *shall be stated* 'the names, description,

physical marks, etc., and every Chinese laborer *so departing* from the United States *shall be* entitled to and *shall receive,* * * * from the collector, * * * at the time such list is taken, a certificate.' * * * The certificate *herein provided for* shall entitle the Chinese laborer *to whom the same is issued* to return and re-enter the United States upon producing and delivering the same to the collector of customs, * * * and *said* certificate shall be the only evidence permissible to establish *his* right of re-entry." *Ex vi termini,* all those provisions apply, and can only apply, to those of the class who depart after the passage of the act. The future tense is used throughout the section, and the acts to be performed can only be performed in the future; and "*said* certificate," which shall be the only evidence permissible to establish a right of re-entry, is the certificate provided for in the first part of the same section, to be issued to *future departing* laborers. And those who receive it, and *only* those who can receive it, are the ones to produce it, as the only permissible evidence of their right to return. *No certificate is provided for those already gone before the passage of the act,* and there is no requirement that they shall produce one. *Nothing is said as to what the evidence of a right to re-enter shall be for those not provided for in this section.* No practical form of evidence other than that recognized by the ordinary law of evidence could be provided for them, *and none was attempted to be provided. As to those who had a right to return,—under the provisions of the treaty, and under the express provisions of the first clause of section 3 of this amended act, in language similar to that of the treaty, in regard to whom no specific evidence is provided,—the ordinary rules of evidence as to competency must apply, for no others are prescribed.* That congress could not have intended to require the collector to go on board vessels *already departed,* and *before* their departure issue certificates to Chinese laborers who were already gone and safely landed in China, must be manifest.

In *Leong Yick Dew,* 19 Fed. Rep. 493–496, *three judges sitting and concurring* in the decision, we said:

"Congress could not possibly have intended to require that class of Chinese laborers to procure the required certificate where it was a physical impossibility for them to obtain it; and it is impossible for me to believe, under the circumstances, that congress intended to arbitrarily exclude that class in direct violation of the express terms of the treaty protecting them. Congress had declined to enact any such legislation as is contained in the restriction act while the Burlingame treaty was in force, for the reason that it would be an act of bad faith on the part of the United States towards China, and a direct violation of the solemn stipulations of the treaty between the two governments. The United States went to the trouble and expense, and incurred the delay, of sending a special mission, composed of three distinguished gentlemen, to China, for the express purpose of procuring a modification of the Burlingame treaty, in order to enable the United States to adopt the legislation now in question, without committing an act of bad faith towards China, and without violating the treaty stipulations between the two nations. A treaty was made with the modification sought by us, which was ratified by, and apparently satisfactory to, both nations. And the modified treaty, in

express and the most explicit terms, protected the class in question in their right to remain in the United States, or ' to go and come of their own free will and accord,' and also provided that they ' shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nations.'

"It is expressly stipulated in the supplementary treaty ' that the legislation in regard to Chinese laborers will be of such character *only as is necessary* to enforce the regulation, limitation or suspension of emigration,' and that ' the limitation, or suspension shall be reasonable.' Conceding the legislation requiring Chinese laborers departing from the United States after the passage of the act in question, and having an opportunity to do so, to procure and produce the required certificate to be ' necessary' and ' reasonable,' still such a requirement, as to those who departed after the date of the treaty, and before the passage of the act, or before it was practicable or possible to obtain the certificate, could neither be necessary nor reasonable.     If congress then intended by this act to make this provision, requiring the prescribed certificates, applicable to those Chinese laborers who were in the United States at the date of the treaty, and who left before the passage of the act of May 6, 1882,—before it was possible to obtain the certificate,—or intended to altogether exclude those already departed, then it was the deliberate intention of congress to act in bad faith towards the government of China, and to violate the solemn obligations of the very treaty it had taken so much pains to obtain, in order to enable it to honorably legislate at all upon the subject.     Why take all this trouble to negotiate a treaty, if it was intended, at last, to flatly disregard it, and legislate in direct violation of its most solemn and vital stipulations?     Congress might, with just as much propriety, have ignored and disregarded the Burlingame as the supplemental treaty.     There would be just as much propriety in wholly repudiating the treaty, as to repudiate it in this vital part, which the Chinese government took care to have inserted.     It would be to the last degree absurd, under the circumstances, to suppose for a moment that congress intended to make the provisions of sections 3 and 4, relating to certificates, applicable to the class of Chinese laborers referred to.     We cannot attribute to congress a deliberate intention to commit any such act of bad faith, without provisions manifesting such a purpose, far more explicit than any found in the act.     It would be disrespectful to that body, if not absolutely indecent, to attribute to it such an act of bad faith.

"Again, the same section which requires the certificate gives to the departing Chinese laborer an absolute, indefeasible right, without cost or expense, to have the certificate, in order that he may be able to produce it as evidence of his right to re-enter the United States.     The necessity to produce it, and the right to have it, in order that he may produce it, are correlative conditions.     The one provision is the complement of the other: they are reciprocal and must go together.     The obligation to produce the certificate presupposes the practicability, or at least the possibility, of procuring it in order that it may be produced.     The two provisions go together and form but one legal conception.     The obligation to produce, and the right and ability to obtain it, are *dependent*, and *not independent*, conditions.     One is the counterpart of the other, and it is not to be supposed that congress would have adopted one branch of the proposition without the other, otherwise it would have distinctly done so in terms.     If, then, it is impossible to comply with the condition, the impossible condition must be regarded as not intended as to this class of laborers; or, if intended, it must be void.     The law requires nothing impossible,—*lex non cogit impossibilia;* Bouv. Law Dict. 'Maxims;' Broom, Max. 242; and *lex non intendit aliquid impossibile,* (Bouv. Law Dict.,)—the law intends not anything impossible,—are among the most venerable maxims of the law.     In a statute, ' no text imposing obligations

is understood to demand impossible things.' Sedg. St. Law, 191. 'Provisions in acts of parliament are to be expounded according to the ordinary sense of the words, unless such construction would lead to some unreasonable result, or be inconsistent with or contrary to the declared or implied intention of the framer of the law, in which case the grammatical sense of the words may be modified, restricted, or extended to meet the plain policy and provision of the act.' Dwar. St. 582. The rule is to construe the words 'in their ordinary sense, unless it would lead to *obscurity or manifest injustice,* and if it should so vary them as to avoid that which certainly could not have been the intention of the legislature, we must put a reasonable construction upon the words.' Id. 587. See *Donaldson* v. *Wood,* 22 Wend. 399; *Lake Shore Ry. Co.* v. *Roach,* 80 N. Y. 339.

"'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to *injustice, oppression, or an absurd consequence.* It will always, therefore, be presumed that the *legislature intended exceptions to its language which would avoid results of this character.* The reason of the law in such cases should prevail over the letter.' *U. S.* v. *Kirby,* 7 Wall. 486. 'In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. * * * To require a heavy and almost impossible condition to the exercise of this right, with the alternative of payment of a small sum of money, is, in effect, to demand payment of that sum.' *Henderson* v. *Mayor of New York,* 92 U. S. 268. See, also, *Brewer* v. *Blougher,* 14 Pet. 198; *U. S.* v. *Freeman,* 3 How. 564. So in the case of the class of Chinese laborers now under consideration. To require them to produce a certificate as the *only* evidence of their right to land, when it was impossible or impracticable to procure it, would be, in effect, to absolutely and unconditionally exclude them. Yet it is manifestly the policy, intent, and reason of the law to carry out in good faith the stipulations of the treaty, that they 'shall be *allowed to go and come of their own free will and accord;'* and '*be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation.'* We are, therefore, fully satisfied that those Chinese laborers who were in the United States on November 17, 1880, and left before the passage of the restriction act, and those, also, who came into the United States and departed therefrom between that date and May 6, 1882, are entitled to re-enter the United States upon satisfactory evidence other than the certificates provided for in said section 4."

The foregoing was said with reference to the act of 1882 before its amendment, but it applies with even greater force to the act as amended in 1884.

In *Ah Quan's Case,* arising under this act, as amended in 1884, after a further discussion of this point, as applicable to the act as amended, we stated our conclusion as follows, (21 Fed. Rep. 184:)

"To hold that congress intended to require the performance of the dependent obligation, on the part of the Chinese laborer, until the government has discharged its correlative and precedent duty and obligation, upon which his obligation rests, imposed by the act, by furnishing the certificate, and thereby rendering it possible for him to produce it, would be to attribute to congress a deliberate intent to enact a palpable and glaring absurdity, thereby violating one of the most venerable canons of statutory construction, that a statute must not be so construed as to lead to an absurd conclusion. We must conclude, therefore, in the absence of any express declaration to that effect, and of any reference whatever to those who had already departed, with a right, at the time of their departure, secured by express terms of the treaty, to return, that it was not intended to require the production of the certificate by those

who departed from the country before it was possible to obtain it. And, in the absence of any provision so declaring, that congress did not, in fact, intend to exclude such Chinese laborers as were in the country at the time mentioned, is clearly manifest, because it has said so in express terms in the provision of section 3, 'that the two foregoing sections [excluding Chinese laborers] shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880,' etc. It is clear, from the necessities of the case, that this section is only applicable to those who departed after the passage of the act, and who had the opportunity to procure the certificate. To hold otherwise would be to render this clause, making the impossible certificate the only evidence as to those who had departed before the passage of the act, absolutely inconsistent with the clause of section 3 referred to, that the preceding sections 'shall not apply to Chinese laborers who were in the United States' at the designated period, and render that provision wholly nugatory, as well as to violate the treaty which the act proposes to execute and not to abrogate. The different provisions of the statute must be so construed, if possible, that they can stand together, and not so as to nullify each other. The clause of the amendment making the certificate the only evidence, as to those to whom it is applicable, of a right to re-enter the United States, only declares in express and explicit terms what we held the original act to mean, and in no way changes its effect in this particular as we had construed it.

"Our construction of the original act in *Leong Yick Dew*, 19 FED. REP. 491, was before congress at the time of the passage of the amendatory act. If it had been intended to make the amendment as to the prescribed certificate being the only evidence of a right to return applicable to those Chinese laborers who were in the country at the date of the treaty, and who departed after that date, and before it was possible to obtain the certificate required, as to whom *we had before distinctly held it to be* inapplicable, congress would certainly have amended the first clause of section 3 so as to read in substance as follows: 'The two preceding sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880, etc., *except as to those who departed from the United States after said seventeenth day of November*, 1880, *and before the passage of the act, or before it was possible to obtain such certificate*.' This is, in effect, the way those who insist upon the production of such certificate by that class as the only evidence of their right to re-enter the United States must read it, in order to sustain their view, or the view that it was intended absolutely to exclude that class in violation of the treaty stipulations. Congress has not introduced any such exception, and we are not authorized to interpolate it into the act. To do so would be to legislate, not to construe. The action of congress in not introducing any exception of the kind indicated, but, on the contrary, so amending the act as to make the propriety of our construction more clearly manifest, in view of our well-known previous construction of the original act on this very point, is, in effect, an emphatic approval of that construction."

See, also, the case of *Shong Toon*, 21 FED. REP. 386, where this question is well discussed by HOFFMAN, district judge.

Another shade of the opposing views maintained by the United States attorney, but essentially the same, has been suggested, which *necessarily* assumes that section 4 does not apply to those who departed prior to the passage of the act of 1882. It is that congress did not intend that any of these Chinese laborers who were in the country on November 17, 1880, who had departed before the passage of the act of 1882, or, in other words, who were not still in the country at that date, should return at all, and consequently that there was

no need of requiring as to them the certificate prescribed by section 4 or any other.    There is not one word in the act that directly declares or hints at such a purpose, and not one section, clause, or word from which an inference of such intent necessarily or naturally arises; nor does it necessarily or naturally arise upon the whole act taken together.    On the contrary, the opposite intent, as we have seen, is expressed in precise and unmistakable language, that cannot be misunderstood, in that clause of section 3, which provides "that the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880, or who shall come into the same before ninety days next after the passage of the act to which this is amendatory."    This language embraces every individual member of the class to which it refers, no matter whether he was in the country at the time of the passage of the act or not, and its force and effect cannot be limited except upon some vague, imaginary inference of a purpose not justified by anything found elsewhere in the act.    The only supposed ground for the inference suggested, not already noticed, arises out of sections 5 and 12.

Section 5 provides "that any Chinese laborer mentioned in section 4 of this act, *being in the United States*, and desiring to depart from the United States *by land*," shall be entitled to demand and receive a certificate similar to those given to those departing by water, etc. The limitation is expressly restricted to the class provided for in section 4; that is, those, necessarily, who depart after the passage of the act.    It is suggested that this clause, "*being in the United States*," indicates that it was only intended that those allowed to return are only such of those who were in the United States on November 17, 1880, as were still remaining in the United States at the date of the passage of the act, and that the first clause of section 3 should read: "That the two foregoing sections shall not apply to Chinese laborers who were in the United States on the seventeenth day of November, 1880, *and who are still in the United States at the date of passage of this act.*"    I do not draw any such inference from that clause of section 5, either taken alone or in connection with any other provisions of the act.    Congress has not inserted in section 3 any such clause as "*who are still in the United States at the date of the passage of this act*," or *any equivalent language*.    To insert such language would be to change the entire scope of the provision.    As congress has not seen fit to insert words so largely limiting the number embraced in the language of section 3 *as actually used*, we certainly are not authorized to legislate and insert it.    The inference I draw, on the contrary, is that in this section it appears by the express terms of the provision that it was only intended to require those who were in the country at the date of the passage of the act, and who could comply with the act, to procure the certificates and produce them on their return; or, in other words, it expressly sanctions what I have endeavored to main-

tain the true construction of section 4 to be; that its provisions were only intended to be applicable to those who still remained in the country at the date of the passage of the act, and *no provision at all is made as to what evidence those who departed before the passage of the act shall produce, and they are left to the usual evidence* recognized as competent by the general laws of the land. This clause, as I think, confirms instead of opposes the view which I have adopted and endeavored to maintain. Neither the provisions of section 4 nor 5 apply to those who departed before the passage of the act, but are limited to those who were in the country at the date of its passage, and were, in fact, able to comply with its terms, and no other view can be sustained without incorporating into sections 3 and 4 language not used or authorized by congress,—without further amending the act.

From the fact that section 4 prescribed a certain certificate to be procured and produced on return by those Chinese laborers who were in the country at the date of the treaty and departed after the passage of the act, and who could procure and produce it; and from the fact that *such* parties are required to procure and produce said certificate—the certificate issued to that class of Chinese laborers—as the only permissible evidence of *their* right to return; and from the further fact that *nothing* is said as to what kind of evidence shall be produced by all those Chinese laborers who were residing in the country on November 17, 1880, and who left before May 6, 1882, and who, under the treaty, and under the express provision of the first clause of section 3 of the act itself, are entitled to return,—it is sought to draw the inference that congress intended that those very Chinese laborers mentioned in the treaty, and the first clause of said section 3, as being entitled to return, who had departed before May 6, 1882, should not be permitted to return at all. I do not, myself, perceive how such an inference or conclusion can be drawn from such premises. There is nothing in the least respect inconsistent in the two ideas: (1) That those who had departed before the passage of the act of 1882, to whom it would be impracticable to apply any other rule as to the competency of evidence, or to require any other kinds of evidence than those recognized by the general law of the land, should not be required to produce any other kind of evidence; and (2) the idea that those who departed after the passage of the act, and who could procure the more certain prescribed certificate, should be required to procure and produce such certificate. The conditions of the two classes are radically different, and different conditions require, or at least admit of, different treatment and different rules. The rules applicable to these two conditions in no way interfere with each other. They can stand, and, consistently, operate together; and the fact that congress has prescribed a certain certificate for parties entitled to re-enter the country, to whom they are, practically, applicable, under certain conditions in which they are found, affords no inference that congress, by so providing for such conditions and such

parties, and saying nothing about another class, surrounded by different conditions, equally entitled to re-enter under the express provisions of the same act and treaty, to which class a requirement to produce a similar certificate cannot possibly be made practically applicable, were intended by congress to be excluded altogether. Especially is no such inference afforded where the general rules of evidence applicable are practicable and effective as to such latter class. I am not aware that any statutory provision was ever held to be repealed, abrogated, nullified, or in any way rendered ineffectual by some other provision in the same act, saying nothing at all about it, in no way inconsistent with it, and practically or possibly applicable, only, to other parties and other conditions. I am not aware of any rule of statutory construction, justifying such an inference, not naturally arising out of the conditions, or such an implied abrogation of another *express* provision of an act. Section 3 expressly provides that "the two foregoing sections shall *not apply* to Chinese laborers who were in the United States on the seventeenth day of November, 1880. * * * *Nor* shall said sections apply to Chinese laborers who shall produce" the certificate provided by section 4, for those to whom its provisions can be made applicable shall apply neither to one "*nor*" the other. What is the purpose or use of the first branch of this provision, if, because, congress provided no kind of evidence other than that recognized by general provisions of law, and said nothing about the evidence as to them, it is to be inferred from the provisions for certain evidence for the *second* class that it was intended that all of the first class who departed before the passage of the act, and who were, therefore, not included in the second class, were to be altogether excluded, and those of the second class were, after all, the only ones intended to be permitted to re-enter the United States at all? Some effect must, certainly, be given to the first as well as to the second class of section 3. It is as clear and specific as the second, and cannot be misunderstood. It must stand, or be overruled and abrogated by an inference not necessarily or even naturally arising out of the conditions. But none can be given it, if it is to be inferred, from the provision of a specific class of evidence for the second class, that the first are to be altogether excluded. I confidently maintain that no such inference can be justified by any established rule of statutory construction, or without ignoring and utterly disregarding the unmistakable meaning of language,—without amending instead of construing it. *It is the first time in my experience that an express, clear, and explicit provision of a statute has been claimed to have been annulled by a subsequent provision relating to another class of subjects, in no way referring to the clause claimed to be abrogated, and not in the slightest degree inconsistent with it.*

Some support to the inference sought to be drawn from section 5 is also attempted to be drawn from the first clause of section 12, providing "that no Chinese person shall be permitted to enter the

United States *by land* without producing to the proper officer of customs the certificate in this act required of Chinese persons seeking to land from a vessel." This is only the complement or counterpart of section 5 out of place. Although broad in its terms, it is evidently intended to refer only to the certificate provided for in section 5 to be issued to those departing by land after the passage of the act, like the provisions of section 4, applicable to those provided for in that section. The two provisions of sections 5 and 12 must be read together. It would seem to have been forgotten in draughting section 5, and afterwards inserted out of place with other provisions not properly germane to it. Besides, by its express terms, it only applies to passengers who enter "*by land*," and cannot be extended beyond its terms. It can do little to support an inference that has no other basis whatever upon which to rest, and it certainly does not authorize us to interpolate a clause into section 3 greatly limiting its scope, and which congress itself did not enact.

The question directly presented in this case is whether a Chinese laborer who was in the United States at the date of the treaty, but departed therefrom before the passage of any law requiring him to procure a return certificate, must now, under the provisions of section 4 of the amended act of 1884, be denied the right to land, for failure to procure the certificate required by that section, or whether he can be permitted to land at all. But the construction of the amended act contended for by the United States attorney, and which seems to be adopted by the circuit justice, will not merely affect the rights of those alone who departed from the United States prior to the passage of the act of May 6, 1882. The language of the fourth section of the act is deemed, by the circuit justice, so peremptory that it absolutely prohibits the landing of all laborers who shall fail to produce the certificate *therein required*, although such prohibition may be in clear violation of rights solemnly guarantied by the treaty of November 17, 1880. But, if such be the true construction to be given to the section in question, it will exclude from the United States those Chinese laborers who have departed after obtaining the certificate required by the act of 1882, for they, like those who departed before the passage of any law on the subject, will be unable to produce the certificate required by the amendatory act of 1884. The custom-house authorities have hitherto, and since the passage of the act of 1884, allowed Chinese passengers to land who produced certificates issued in conformity with the provisions of the act of 1882, on the ground that the faith of the nation was pledged to allow the return of those Chinese laborers who left the United States while the act of 1882 was in force, and who complied with its requirements.

But if the ruling of the presiding justice is to prevail, the certificate issued under the act of 1882 will, in my judgment, upon that construction, no longer be available, and all those Chinese who departed from the country during the two years or more from June 6, 1882, to

July 5, 1884, relying upon the certificates issued by the collectors authorizing their return, who have not already returned, must be excluded. It may be said that these certificates are similar in substance to those required by the act of 1884. This is, to a certain extent, true. But they are *not identical.* They differ in some *essential* particulars. The latter certificates, unlike those provided for by the act of 1882, are required to contain the statement of "the individual family and tribal name" (of the laborer) in full, and "*his occupation when and where followed.*" The certificate is to be "issued in the name of the collector, and *attested by his seal of office,*   *   *   *   and *said* certificate shall be *the only evidence permissible* to establish his (the laborer's) right of re-entry." It will be seen that this certificate differs essentially from that provided for by the act of 1882, embracing other particulars not required under the original act; and, if the last clause I have quoted is to be held to be applicable to *all* returning laborers who left the United States before the passage of any law on the subject of certificates, it must also be held to apply to all laborers who fail to produce the "*said certificate*" in that section described and required. I know not by what authority we can hold the law applicable to all returning laborers, and at the same time admit laborers who produce, not the certificate required by the existing law, but a certificate containing less, and which is essentially different, issued in conformity with a repealed and superseded law. If congress is to to be deemed to have violated or disregarded the stipulations of the treaty with China, it must also be deemed to have violated the implied pledge given in the law of 1882, that those who should leave the United States after fully complying with its provisions should be allowed to return. Those who received the certificates issued during a period of two years, under the act of 1882, and departed upon the faith of the law and the treaty, who have not yet returned, are no more excepted under the law, as amended in 1884, than are those who departed between the dates November 17, 1880, and May 6, 1882, relying on the assurances of a right to return contained in the then existing treaty and laws; and they must also be excluded. If congress is capable of such acts of bad faith as are shown in the passage of the original and amendatory acts, upon the construction given them by the presiding justice, then it must be capable of repeating these acts of bad faith at each recurring session, and thereby annually cutting off a considerable portion of those who left with a right to return guarantied to them by both the treaty and the law in force, and there is nothing in the treaty, the law, or the good faith and honor of the nation, upon which these people can rest in security. If it had been the intention to violate the specific terms of the treaty which secured the right to those Chinese laborers who were in the United States at the date of the treaty "to go and come of their own free will and accord," by excluding from returning all those who departed for temporary purposes upon the faith of the treaty prior to the passage of the act of

1882, congress would certainly have acted in a manly way, and expressed that intention boldly, openly, and by plain and direct language which could not be misunderstood.

In the language of the district judge in *Shong Toon's Case, supra*: "Can it be contended that any court should so construe this act—if such construction could by possibility be avoided—as to impute to congress, when legislating 'to execute certain treaty stipulations with China,' and while affecting to acknowledge rights secured by the plain language of the treaty, the intention to attach, by retrospective and essentially *ex post facto* legislation, conditions precedent to the exercise of that right which it was impossible to perform, and to enact that the non-performance of those conditions should forfeit the right? And this construction we are asked to give to a law which discloses a most scrupulous solicitude on the part of congress to avoid even the appearance of retrospective legislation; for it provides that the sections prohibiting the coming to the United States of Chinese laborers, not only shall not apply to Chinese laborers in the United States at the date of the treaty, but also to those who might come into the United States before the expiration of ninety days next after the date of the passage of the law, thus protecting from its operation not merely Chinese laborers *in transitu*, but laborers who might leave China before the expiration of a period of time reasonably sufficient for notice of the law to reach that country. It appears to us very plain that, by adopting the construction contended for, we should, in effect, accuse congress of gross disingenuousness, or of utter disregard of a treaty stipulation, to the observance of which the national honor was pledged." In legislation respecting rights expressly secured by solemn stipulation in a treaty sought and obtained by ourselves, affecting the good faith and honor of the United States, I cannot impute to Congress a purpose to—

"Palter in a double sense,
That keeps the word of promise to the ear,
And breaks it to the hope."

It is insisted, also, that it must be presumed that all who departed before May 6, 1882, have returned, and, at all events, they have now had a sufficient time to return, and ought not any longer to be permitted to return. If this were so, it could not affect the construction of the act. The act was as broad in its terms on the day of its passage as it is now; and it affected those who departed the day before its passage, as well as those who left a year before. The act has made no distinction and no exception on the ground of lapse of time. It might as well be insisted that one who goes away with the proper certificate shall not return after the lapse of a year or two years, where the law prescribes no such limitation. Neither the treaty nor the law prescribed any limitation as to the time when those who departed before May 6, 1882, should return. It would doubtless be proper for congress to provide that both of those who departed

without certificates before the passage of the act, and those who depart after its passage with certificates, shall exercise their right to return within some specified time, upon giving them a reasonable time to return after the passage of the act before it should be enforced against those already gone under the prior existing laws. Such a provision would doubtless be reasonable within the provisions of the treaty, and not in conflict with its provisions. But no such provision has been made, and the courts are not authorized to introduce one into the act. Nor, in the absence of such a provision, can lapse of time since the departure with the vested rights under the treaty and laws, as they existed at the time of leaving, afford any aid in the construction of the act, as it was actually passed.

For the reasons stated I am satisfied that the provisions respecting certificates in section 4 of the amended act have no application whatever to these Chinese laborers who were residing in the United States on November 17, 1880, and who afterwards departed prior to May 6, 1882; that they were not intended by the act in question to be excluded from the country for want of such certificate, or on any other grounds; and that such Chinese laborers are entitled to re-enter the United States upon their return, upon other satisfactory evidence, without producing the certificate prescribed by said section.

There is no possible difficulty or inconsistency in applying the ordinary rules of evidence to those who departed prior to May 6, 1882, as to whom no specific evidence has been prescribed, and in insisting upon the certificate prescribed for those who departed after the restriction act, and to whom this restriction is practically applicable, without abrogating the right secured to them both by the treaty and section 3 of the law. And I have no doubt that it was the intention of congress to limit the certificate prescribed by section 4 to the latter class, and leave the former to be governed by the ordinary rules of evidence. The construction I have given to this law not only reconciles the legislation with the observance of the plighted faith of the nation, but it carries out and effectuates the object of the treaty and the law. The evil to be remedied was the continued, unrestricted immigration of Chinese laborers. It was recognized that rights of those who were already here were secured by the Burlingame treaty and international law. No proposition for the expulsion, directly or indirectly, would have been made by the United States, or entertained by the Chinese government; nor, if made and admitted, would it have received the sanction of congress. Both the treaty and the law recognized these rights, and the legislation was directed solely against any further addition to the numbers of the Chinese then here, or who should come within 90 days after the passage of the act. This object, the law in its practical operation, has been attained. Not only has there been no accession to the number of the Chinese in this country, but the statistics of the custom-house show that, during the 28 months which have elapsed since the passage, the number of de-

partures exceed the number of arrivals by 12,000. Not only, therefore, has the number of the Chinese on this coast not increased, but it has been diminishing (after making due allowance for those who may have clandestinely crossed the northern boundary of the United States) at the rate which ought to satisfy the sturdiest opponent of this class of laborers,—a rate which could not be largely increased without serious disturbance to the industries of this coast. But, even if this were not so, there is a price too high to be paid, without absolute necessity, in any case, for the exclusion of Chinese laborers, and that price is the national honor. And especially, when, as I have shown, the plighted faith of the nation may be kept without impairing the effectiveness and satisfactory operation of the law. By the construction here adopted, also, the treaty and the law are in harmony; and the various provisions of the act are consistent and in accord with each other. But, on the construction insisted upon by the United States attorney and sanctioned by the presiding justice, the treaty and the law conflict, and various provisions of the restriction act itself are inharmonious and inconsistent with each other.

I therefore dissent from the decision of the presiding justice, and from the order remanding petitioner.